**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 25-cr-162-CNS

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.      ADEPOJU BABATUNDE SALAKO,

      Defendant.

---

## INDICTMENT

---

The Grand Jury charges:

### COUNT 1
### Conspiracy to Commit Wire Fraud

At all times material to this Indictment:

**Individuals and Entities**

1.      Defendant ADEPOJU BABATUNDE SALAKO was a resident of the State and District of Pennsylvania.

2.      SALAKO was the sole owner of Tudor Smart Phones & Accessories LLC ("Tudor"), a Pennsylvania-registered limited liability company

3.      CONSPIRATOR 1, whose identity is known to the Grand Jury, resided in Nigeria.

**Background on Pandemic Benefit Programs**

4.      Unemployment Insurance ("UI") is a joint state-federal program that provides monetary benefits to eligible lawful workers. UI benefits are intended to provide temporary financial assistance to lawful workers who become unemployed through no fault of their own. Claimants seeking UI benefits are required to complete an online application that includes, among other things, the claimant's name, date of birth, social security number, and the reason why the claimant is unemployed. In the State of Colorado, the Colorado Department of Labor and Employment ("CDLE") administers the UI program. The CDLE, like other state workforce agencies, relies upon the information in the application to determine UI benefits eligibility. If the CDLE approves a UI claim, the claimant can receive UI benefits by direct deposit.

5.      In March 2020, the Coronavirus Aid, Relief, and Economic Security ("CARES") Act was enacted. It expanded UI benefits by providing additional federal funding and provided emergency assistance to small business owners suffering adverse economic effects caused by the COVID-19 pandemic. It also provided funding for small businesses affected by the COVID-19 pandemic through the Paycheck Protection Program ("PPP") and the Economic Injury Disaster Loan ("EIDL") program, each administered by the United States Small Business Administration ("SBA").

6.      To receive federal money for UI benefits after passage of the CARES Act, the CDLE had to request money from the United States Department of the

2

Treasury ("Treasury") through a Treasury web interface program. To request federal funds, the CDLE made a payment request to Treasury, and Treasury would then disburse the funds to the CDLE's bank account.

7.    The EIDL program is an SBA program that provides low-interest financing to small businesses in regions affected by declared disasters. During the COVID-19 pandemic, qualifying businesses affected by the pandemic could obtain an EIDL by submitting an application to the SBA and providing information about operations prior to January 31, 2020, including its number of employees, revenues, and cost of goods sold. The amount of the loan, if approved, was determined in part based on the information provided concerning the gross revenue and cost of goods sold. EIDL and EIDG funds were issued directly by the SBA. Until April 2021, under the EIDL program, a small business could receive a loan from the SBA in an amount of up to six months of working capital with a maximum of $150,000. In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses, known as Economic Injury Disaster Grants ("EIDG"). Initially, the amount of the EIDG was determined by the number of employees the applicant certified having. The EIDGs did not need to be repaid.

8.    The PPP provided forgivable loans to small businesses. To obtain a PPP loan, a qualifying small business was required to submit a PPP loan application signed by an authorized representative of the business and to make affirmative certifications, including that the information in the application and supporting documents was true and accurate. The amount of the loan was

3

calculated based on a business's representations about its monthly payroll expenses. Businesses were also required to provide documentation showing their payroll expenses, such as filed federal income tax documents. PPP loan applications were received and processed, in the first instance, by a participating lender. If a PPP loan application was approved, the participating lender funded the loan using its own money, but the loans were guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan. The SBA paid participating lenders a processing fee from its Colorado finance center for each funded PPP loan.

**The Conspiracy**

9. From in or about March 2020 through in or about September 2021, in the District of Colorado and elsewhere, defendant ADEPOJU BABATUNDE SALAKO and CONSPIRATOR 1, together and with each other, knowingly agreed to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

**Manner and Means of the Scheme and Conspiracy**

Acting interdependently, SALAKO and CONSPIRATOR 1 carried out the conspiracy using the following manner and means:

10. After the CARES Act authorized EIDL and PPP funding and expanded federal funding for UI benefits, SALAKO and CONSPIRATOR 1 acted together to request CARES Act funding of over $700,000. They obtained approximately $73,506.16.

11.    SALAKO and CONSPIRATOR 1 used the WhatsApp messaging service to exchange messages, documents, and information about the conspiracy, including to exchange stolen or false identities and to share bank account details for use on fraudulent applications.

12.    SALAKO and CONSPIRATOR 1 used an email forwarding service known as 33mail to create multiple usernames on custom email domains. Although the email addresses appeared to be unique and refer to different individuals, 33mail allowed all the usernames on the same domain to forward emails to the same email address.  As one example, SALAKO used multiple usernames on the tudor31620.33mail.com domain, but all usernames on this domain forwarded to one of SALAKO's gmail accounts.

13.    Along with submitting his own fraudulent applications for UI benefits, SALAKO aided and abetted CONSPIRATOR 1 by sharing SALAKO's bank account numbers, phone number, and other identifiers with CONSPIRATOR 1. CONSPIRATOR 1 then would list SALAKO's information on fraudulent loan and UI benefit applications.

14.    To conceal that CONSPIRATOR 1 was located overseas, SALAKO's United States-based bank accounts and contact information was used on applications, which created the false appearance to lenders or state workforce agencies that CONSPIRATOR 1 was located in the United States and eligible for government benefits.

UI Benefit Scheme and Conspiracy

15.    Between January 4, 2021 and March 20, 2021, SALAKO submitted approximately 15 fraudulent applications for UI benefits to the CDLE, using stolen or false identities.

      a.    SALAKO subscribed to personal information search websites such as TruthFinder. Before submitting fraudulent applications to the CDLE for UI benefits, SALAKO looked up names and addresses of residents of Colorado so he could submit applications using their actual identifiers.

      b.    Approximately 10 of SALAKO's UI claims listed as a contact email a username linked to the tudor31620.33mail.com email domain that appeared to be separate emails, but which were configured through the 33mail service to forward to a single gmail account. Three other claims used a different 33mail.com email domain used by SALAKO that forwarded to another email account he monitored.

      c.    The CDLE paid one UI claim submitted by SALAKO. On March 3, 2021, the CDLE paid $649 to a Discover Bank account controlled by SALAKO based on a fraudulent UI claim SALAKO submitted using the stolen identity of V.H.

      d.    Other claims were approved for payment, including a claim SALAKO submitted using the stolen identity of M.M. for $890,

but the CDLE placed a payment hold after discovering that the name on the bank account did not match the name on the UI claim.

16.    Between January 24, 2021 and May 19, 2021, CONSPIRATOR 1 submitted at least 54 fraudulent applications for UI benefits to the CDLE, using stolen or false identities and directing that the CDLE deposit payments to accounts controlled by SALAKO. The CDLE approved 7 of these fraudulent claims and paid $15,431 in UI benefits to SALAKO-controlled bank accounts.

17.    SALAKO and CONSPIRATOR 1 acted for their mutual benefit by coordinating fraudulent activity. They exchanged bank account numbers, updated each other about the status of claims, and coordinated the deposit and transfer of fraud proceeds. For example:

a.    On February 17, 2021, CONSPIRATOR 1 messaged SALAKO that he would direct the CDLE to deposit UI benefits to a bank account in SALAKO's name. SALAKO agreed to receive the funds. After the CDLE paid $949 to SALAKO's bank account on February 22, 2021, CONSPIRATOR 1 messaged SALAKO "Colorado don dey payyy!!!"

b.    On March 14, 2021, SALAKO messaged CONSPIRATOR 1 to work together on a UI claim. SALAKO messaged a bank account number created using the stolen identity of C.W. to CONSPIRATOR 1. CONSPIRATOR 1 then submitted a CDLE

7

claim using a stolen identity of L.H. The CDLE approved the UI claim for L.H. and direct deposited $598 to the bank account in the name of C.W. on March 15, 2021.

18.    In addition to submitting fraudulent UI claims to Colorado, SALAKO submitted fraudulent UI claims in other states using stolen or false identities, including Maryland, Minnesota, New Hampshire, and New York. He received approximately $26,801.16 from other states.

19.    The submission of fraudulent UI claims by SALAKO and CONSPIRATOR 1 caused a server used by the CDLE located outside of Colorado to transmit wires to Colorado, which led CDLE employees to mail letters to the addresses associated with the UI claims.

EIDL Scheme and Conspiracy

20.    Between January 16, 2021 and March 3, 2021, SALAKO submitted and aided and abetted in the submission of at least 10 fraudulent applications for EIDLs to the SBA, using stolen or false identities. The applications requested loans totaling approximately $287,422.50. The SBA did not approve any of these applications.

21.    Between January 26, 2021 and April 26, 2021, CONSPIRATOR 1 submitted and aided and abetted in the submission of at least 3 fraudulent applications for EIDLs to the SBA, using stolen or false identities. CONSPIRATOR 1 listed a phone number and bank account belonging to SALAKO on each

application. The applications requested loans totaling $450,000. The SBA did not approve any of these applications.

PPP Loan Scheme and Conspiracy

22.     On February 11, 2021, CONSPIRATOR 1 submitted a fraudulent PPP loan application in the name of Turn-Turn-Turn Woodturning using the stolen identity of D.P., a resident of Nevada. The application listed a bank account and phone number belonging to SALAKO and a 33mail.com email address that routed to a gmail account used by CONSPIRATOR 1. The application provided false information about the identity of the person submitting the application and the business's operations. On February 12, 2021, a lender approved the application based on the false representations and disbursed $30,625 to a Discover Bank account in the name of SALAKO.

23.     The disbursement of the PPP loan to SALAKO caused the SBA's finance center in Denver, Colorado to transmit a payment file outside of Colorado for an associated lender processing fee.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2-7
### Wire Fraud and Aiding and Abetting Wire Fraud

**The Scheme to Defraud**

24.    Beginning in or about January 2021 and continuing through in or about May 2021, within the State and District of Colorado and elsewhere, defendant ADEPOJU BABATUNDE SALAKO and CONSPIRATOR 1 together and with each other, devised, intended to devise, and participated in a scheme to defraud and to obtain money and property from the CDLE, the Small Business Administration, and private lenders by means of materially false and fraudulent pretenses, representations, and promises, and aided and abetted the same.

**Manner and Means of the Scheme**

25.    Paragraphs 1-8 and 10-23 are re-alleged and incorporated as if fully set forth herein.

**Execution of the Scheme**

26.    On or about the dates set forth below, in the State and District of Colorado, and elsewhere, SALAKO transmitted and caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, pictures, and sounds, as set forth below:

| Count | Date | Description of Wire |
|-------|------|---------------------|
| 2 | 01/25/2021 | Request for payment routed from Colorado to Treasury web interface outside Colorado caused by fraudulent submission of V.H. UI claim |
| 3 | 2/24/2021 | Request for payment routed from Colorado to Treasury web interface outside Colorado caused by fraudulent submission of N.B. UI claim |

10

| 4 | 2/25/2021 | Wire from server outside of Colorado to CDLE employee in Colorado related to claim notification letter mailed to D.B. |
| 5 | 3/4/2021 | Request for payment routed from Colorado to Treasury web interface outside Colorado caused by fraudulent submission of N.B. UI claim |
| 6 | 3/6/2021 | Request for payment routed from Colorado to Treasury web interface outside Colorado caused by fraudulent submission of L.H. UI claim |
| 7 | 3/12/2021 | Request for payment routed from Colorado to Treasury web interface outside Colorado caused by fraudulent submission of L.H. UI claim |

All in violation of Title 18, United States Code, Sections 1343 and 2(a).

<u>COUNT 8</u>
**Money Laundering Conspiracy, 18 U.S.C. § 1956(h)**

27.    Paragraphs 1-8 are re-alleged and incorporated as if fully set forth herein.

28.    Beginning in or about July 2020, and continuing thereafter until in or about July 2021, in the State and District of Colorado and elsewhere, defendant ADEPOJU BABATUNDE SALAKO knowingly combined, conspired, and agreed with co-conspirators known and unknown to the Grand Jury to:

a.    knowingly conduct and attempt to conduct financial transactions affecting interstate commerce that involved the proceeds of specified unlawful activity, that is, wire fraud in violation of 18 U.S.C. § 1343, knowing that the transaction was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

b.    knowingly engage or attempt to engage in monetary transactions, as defined in Title 18, United States Code, Section 1957(f)(1), in criminally derived property of a value greater than $10,000 and that was derived from specified unlawful activity,

12

to wit, a scheme to commit wire fraud in violation of 18 U.S.C.

§ 1343, in violation of 18 U.S.C. §  1957(a).

**Manner and Means of the Conspiracy**

Acting interdependently, SALAKO and other conspirators known and unknown carried out the conspiracy using the following manner and means:

29.    SALAKO's co-conspirators applied for EIDL, PPP, and UI funding using stolen or fake identities. As a result of fraudulent applications, SALAKO's co-conspirators obtained approximately $4,711,200 in EIDL funding and $893,771.34 in UI funding. To obtain this funding, co-conspirators submitted EIDL applications using over 1,000 stolen or fake identities and submitted fraudulent UI benefit claims to approximately 30 different states.

30.    All EIDL payments originated from an SBA finance center in Denver, Colorado. SALAKO and his co-conspirators directed the movement of this money from Colorado to bank accounts in multiple states outside of Colorado.

31.    SALAKO's co-conspirators fraudulently obtained approximately $61,423 in UI benefits from the CDLE after submitting approximately 143 fraudulent UI benefit claims. SALAKO provided his bank account information to co-conspirators so that they could direct CDLE to deposit funds directly to SALAKO's accounts.

32.    SALAKO and co-conspirators exchanged with each other bank account information, including some bank accounts in SALAKO's name and others opened by SALAKO using stolen and fake identities.

33.    After the initial deposit of fraud proceeds in a bank account, SALAKO and co-conspirators would move fraud proceeds through several intermediate accounts using various methods, including ATM withdrawals and deposits, wire transfers, and the purchase and deposit of money orders.

34.    Eventually, after conducting transfers through intermediate accounts, SALAKO and co-conspirators spent fraud proceeds or transferred the money overseas as currency or in the form of goods purchased from the fraud proceeds, such as cars or solar panels.

35.    Co-conspirators also shared in common victims of romance fraud schemes who received fraud money from government agencies and sent to SALAKO and other co-conspirators. The involvement of the romance fraud victims added an additional layer to conceal the involvement of SALAKO and the co-conspirators. In such instances, fraud money was initially deposited into accounts belonging to victims of a romance fraud scheme—including P.B. and J.Y.—who were directed to move fraud proceeds to SALAKO and co-conspirators.

36.    A romance fraud scheme is a type of scheme by which a scammer targets persons looking for partners or friendship on dating websites and other social media platforms.  The scammer may create profiles using fictitious or fake names, locations, images, and personas, allowing the scammer to cultivate relationships with prospective romance fraud scheme victims. Victims may be asked to conduct financial transactions on behalf of the scammer, such as transferring fraud proceeds to conceal the source or destination of the proceeds.

14

c.    Romance-fraud victim J.Y. received approximately $452,300 in EIDL funds and $43,045 in UI benefits to bank accounts in his own name.

d.    Romance-fraud victim P.B. received approximately $301,400 in EIDL funds, $17,700 in PPP funds, and $7,410 in UI benefits to bank accounts in his name.

37.    On applications for EIDL, PPP, and UI funding, multiple co-conspirators designated that lenders or government agencies deposit fraud money into bank accounts belonging to J.Y. and P.B.

38.    After J.Y. and P.B. obtained fraud money, they received instructions to initiate wire transfers and endorse checks and money orders to SALAKO's business (Tudor). For example:

a.    Between June 30, 2020, and July 29, 2020, the SBA made four deposits to J.Y.'s bank account for a total of $452,300 based on four fraudulent EIDL applications submitted using stolen or fake identities.  J.Y. was instructed to make cash withdrawals, purchase money orders, and transfer money to Tudor via wire transfer or cashier's check.  J.Y. sent messages to confirm when he completed an instruction. Between July 16, 2020, and August 10, 2020, J.Y. sent three cashier's checks via mail endorsed to Tudor (totaling $105,000) and two $15,000 wires to a Tudor bank account.

15

b.      Between July 2, 2020, and August 10, 2020, the SBA made three deposits to P.B.'s bank account for a total of $301,400 based on three fraudulent EIDL applications submitted using stolen or fake identities. P.B. was instructed to purchase money orders and cashier's checks and send the money orders and cashier's checks to Tudor via mail. Between July 25, 2020, and August 29, 2020, P.B. sent one money order and six cashier's checks endorsed to Tudor via mail, totaling $264,504.

c.      On March 26, 2021, Cross River Bank deposited $17,708 to P.B.'s bank account. The deposit related to a fraudulent PPP loan submitted in the name of identity-theft victim J.B. on or about March 25, 2021. P.B. obtained a teller check for $17,700 payable to Tudor. On April 13, 2021, SALAKO deposited this check to a Tudor checking account.

39.     After SALAKO received money that passed through the bank accounts of romance-fraud victims, he conducted frequent transactions to move the money to his personal accounts and conceal the source, nature, location, and destination of the fraud proceeds.

40.     It was part of the conspiracy that SALAKO made multiple cash withdrawals from ATMs and branch locations on the same day or on dates in close proximity and wired money between multiple business and personal bank accounts he controlled.

16

41.     After making cash withdrawals from Tudor bank accounts, it was part of the conspiracy that Salako would deposit the cash to personal bank accounts in his own name, often on the same or consecutive days as the initial withdrawal from his business bank account.  From his personal bank accounts, SALAKO then initiated wire transfers to China, Nigeria, and the United Arab Emirates.  Between July 20, 2020 and November 25, 2020, for example, SALAKO wired approximately $932,881 of fraud proceeds from his personal Bank of America account ending in 3033 overseas to these three countries, as well as approximately $30,000 from his other bank accounts.

42.     After receiving one $40,000 cashier's check from J.Y., SALAKO explained why he moved the money between bank accounts through multiple transactions over several days rather than withdrawing all the money at once in a single transaction: "I don't withdraw whole 40k just like that.  I don't do thing rush rush rush rush rush" because it would "raise red flag." Instead, SALAKO stated that he did "things clean, slow."

43.     For his role of laundering fraud proceeds for co-conspirators operating overseas, SALAKO took fees from the money he laundered, typically between 25-60% of the value of laundered funds. For example, on July 16, 2020, when discussing receiving fraud proceeds from J.Y., SALAKO messaged a conspirator that his fee was 25 percent of laundered funds.

44.     SALAKO and his conspirators also spent fraud proceeds to carry on and engage in additional fraud, such as using fraud proceeds to pay phone bills for

numbers used to facilitate fraud, pay subscriptions for personal information search websites such as TruthFinder, and pay subscriptions for email accounts used to facilitate the fraud, including the 33mail.com email domain.

45.     SALAKO and his co-conspirators caused acts in furtherance of the money-laundering conspiracy to take place in Colorado. For example, co-conspirators provided the CDLE with Salako's bank accounts in the United States rather than their own to conceal and disguise the nature, location, source, ownership, and control of their wire-fraud proceeds, including to conceal that the fraud was committed from overseas and that fraud proceeds were eventually transmitted overseas. Co-conspirators also provided the SBA with bank accounts belonging to victims of romance-fraud rather than their own bank accounts for the SBA to wire money from Colorado to those bank accounts outside of Colorado to conceal and disguise the nature, location, source, ownership, and control of their wire-fraud proceeds.

All in violation of Title 18, United States Code, Section 1956(h).

18

## COUNTS 9-12
### Aggravated Identity Theft, 18 U.S.C. § 1028A

46.    On or about the dates listed below, in the District of Colorado and elsewhere, defendant ADEPOJU BABATUNDE SALAKO knowingly transferred, possessed, and used, without lawful authority, a means of identification of the below persons during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c), to wit, wire fraud in violation of 18 U.S.C. § 1343 and conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, knowing that the means of identification belonged to another actual person.

| COUNT | DATE | PERSON |
|---|---|---|
| 9 | 01/27/2021 | V.H., a Colorado resident |
| 10 | 02/18/2021 | M.C.., a Kansas resident |
| 11 | 2/24/2021 | M.M., a Colorado resident |
| 12 | 03/15/2021 | C.W., a New Hampshire resident |

All in violation of Title 18, United States Code, Section 1028A(a)(1).

19

**FORFEITURE**

47.     Upon conviction of any of the violations alleged in Counts 1-7 of this Indictment involving the commission of violations of 18 U.S.C. §§ 1343 and 1349, SALAKO shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any and all rights, title, and interest in all property constituting and derived from any proceeds obtained directly and indirectly as a result of such offense or offenses, including, but not limited to a money judgment in the amount of the proceeds obtained by the defendant's scheme.

48.     Upon conviction of the violations alleged in Count 8 of this Indictment, in violation of 18 U.S.C. § 1956(h), SALAKO shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any and all rights, title, and interest in all property involved in the offense and any property traceable to such property, including, but not limited to a money judgment in the amount of value of the property involved in the offense.

49.     If any of the property described above, as a result of any act or omission of SALAKO cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been substantially diminished in value; or has been commingled with other property that cannot be divided without difficulty, it is the intent of the United States, pursuant to 28 U.S.C. § 2461(c), incorporating 21 U.S.C. § 853(p), to seek forfeiture of any other property of SALAKO up to the value of the forfeitable property described above.

A TRUE BILL:


Ink Signature on File in Clerk's Office
  FOREPERSON


J. BISHOP GREWELL
Acting United States Attorney

By: *s/ Craig G. Fansler*_____
Craig G. Fansler
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California St., Ste. 1600
Denver, CO 80202
Telephone: 303-454-0100
Fax: 303-454-0401
E-mail: Craig.Fansler2@usdoj.gov
Attorney for the United States